UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE I AND JANE DOE II, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | *   Civil Action No. 19-30027-MGM |
| CITY OF NORTHAMPTON, ANDREW | * |
| LINKENHOKER, Superintendent (formerly | * |
| (Principal), JOSEPH BIANCA, Principal | * |
| (formerly Assistant Principal), KEVIN BROWN, | * |
| BRIAN BAGDON, CODY HANLON, | * |
| MARY DOES, and JOHN DOES I-V, | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER ON DEFENDANTS'

MOTION FOR SUMMARY JUDGMENT

(Dkt. No. 98)

March 6, 2023

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Defendants—the City of Northampton ("City"); Trustees of Smith Vocational and Agricultural High School ("SVHS"); Andrew Linkenhoker, formerly the principal of SVHS; Joseph Bianca, formerly the vice-principal of SVHS; and Kevin Brown, a security officer at SVHS[1]—have moved for summary judgment as to all claims asserted against them in the Amended Complaint (Dkt. No. 11) filed by Plaintiffs, Jane Doe I, formerly a student at SVHS, and her mother, Jane Doe

---

[1] Plaintiffs' Amended Complaint (Dkt. No. 11) also included claims against Brian Bagdon, formerly employed by SVHS as a wrestling coach; Cory Hanlon, a former SVHS student; and various Mary Doe and John Doe defendants. Following discovery, Plaintiffs have not identified any Mary Doe or John Doe defendants; they have settled the claims asserted against Hanlon (Dkt. Nos. 157 and 158); and they have not pursued their claims against Bagdon, who has never entered an appearance either pro se or through counsel. This decision does not address these other defendants or the claims asserted against them.

II. Plaintiffs' claims against Defendants arise from a January 30, 2016 incident that took place on an SVHS school bus and involved sexual contact between SVHS students Cody Hanlon, then seventeen years old, and Doe I, then fifteen years old. After learning about the incident, Defendants treated Doe I's involvement in the school bus incident as a disciplinary infraction, despite knowing that she was too young to legally consent to sexual activity. Plaintiffs contend Defendants should have treated Doe I as a potential victim of sexual assault, rather than as a student suspected of a disciplinary violation, and their failure to do so harmed Plaintiffs.

In their Amended Complaint, Plaintiffs asserted seven claims against Defendants (Dkt. No. 11). In Count I, Plaintiffs alleged the City, through the Board of Trustees of SVHS, was negligent in the hiring and supervision of Bagdon, Linkenhoker, Bianca, and Brown. Plaintiffs alleged in Counts II, III, and IV that Linkenhoker, Bianca, and Brown violated Doe I's rights to equal protection and due process secured by federal and state law. Counts V though VII did not include claims against Defendants. Count VIII asserted a claim for negligent infliction of emotional distress as to Doe II against the City, through the Board of Trustees of SVHS, and Count IX asserted a claim by Doe II for loss of consortium. Finally, in Count X, Plaintiffs alleged a claim for defamation against the City and Bianca. Defendants have moved for summary judgment as to all claims in Counts I through IV and VIII through X.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point

2

in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). When ruling on a motion for summary judgment, the court must construe "the record evidence in the light most favorable to the nonmoving party." *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). The court must draw all reasonable inferences in favor of the non-moving party, but must avoid making unreasonable inferences or crediting "bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Cherkaoui*, 877 F.3d at 23 (internal quotation marks omitted). "[I]f there is a genuine dispute of a material fact, that dispute would 'need[] to be resolved by a trier of fact.'" *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)). However, "it is well settled that '[t]he mere existence of a scintilla of evidence' is insufficient to defeat a properly supported motion for summary judgment." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (quoting *Anderson*, 477 U.S. at 252).

### III.    SUMMARY OF FACTS[2]

On Saturday, January 30, 2016, Jane Doe I, then fifteen years old, was one of approximately seven people riding back to SVHS in a school bus following a wrestling match. Doe I's friend, "Melissa Moe," who attended a different high school, was also on the school bus, as was Cody Hanlon, then seventeen years old and one of the members of the wrestling team. The coach of the wrestling team, Brian Bagdon, was driving. Hanlon's grandmother was the only other adult on the bus. Bagdon had not received approval from the SVHS Athletic Director, Jeffrey Lareau, for either Moe or Hanlon's grandmother to be on the bus that day, nor had he notified Lareau that the

---

[2] The facts are taken from the Defendants' 56.1 Statement of Material Facts (Dkt. No. 103) and Plaintiffs' Statement of Material Facts Which are in Genuine Dispute (Dkt. No. 122). Where there are differences between the facts offered by the parties, the court has included Plaintiffs' version of facts unless that version is not supported by the record.

assistant wrestling coach would be driving his personal vehicle to the match instead of riding on the bus. Lareau had instructed all coaches, including Bagdon, that, unless a team required two buses, both of a team's coaches should be on any bus transporting the team.

During the bus ride, Doe and Hanlon sat together under a blanket on the floor in the back of the bus. Hanlon and another male student pressured Doe I to engage in intercourse with Hanlon. Doe I said no, but Hanlon removed her pants and forcibly raped her. Doe I did not communicate about what happened to Bagdon or Hanlon's grandmother. Afterwards she sat in a seat on the bus for the reminder of the ride, while Hanlon and Moe kissed and Moe performed oral sex on Hanlon.

On Monday morning, February 1, 2016, Lareau informed Vice Principal Joseph Bianca that he had heard students engaged in sexual activity on the bus during the Saturday wrestling team trip. He told Bianca that Doe I and possibly a female student who did not attend SVHS had been on the bus. When Bianca learned about the incident on February 1, 2016, he was aware that Doe I was fifteen years old and that, under Massachusetts law, a person under age sixteen cannot legally consent to sexual intercourse. He also knew that Doe I had only recently returned to SVHS following a ten-day suspension imposed at the end of December for an unrelated disciplinary infraction. Bianca was involved in the process of reintegrating Doe I into the school community after that suspension and knew Doe I had attempted suicide shortly after being suspended and been hospitalized for approximately a week.

The same day, Lareau and Bianca went together to inform Principal Andrew Linkenhoker about the incident and Bianca's plans to investigate. Bianca commenced an investigation shortly after talking with Linkenhoker. Although he already knew the investigation was likely to involve Doe I and was familiar with Doe I's recent struggles, Bianca did not speak with a member of the school counseling staff about the incident or Doe I's potential involvement prior to beginning his investigation. Instead, he began by interviewing other students. Students were called to Bianca's

office. As they arrived, Lareau and Kevin Brown, a school security officer, gave the students incident forms and asked them to write down what they knew about what had happened on the bus. The students' statements consistently described several sex acts, each involving one of several male students and either Doe I or Moe. One student wrote that, afterwards, Doe I had talked about other individuals' sexual contacts on the bus and someone retaliated by telling people that Doe I and Hanlon had sexual intercourse on the bus. Despite knowing many details about the incident on Monday, February 1, 2016, Bianca did not talk with Doe I that day. He also made no immediate effort to notify Doe II about the incident, nor did he ensure that the incident was immediately reported to the Massachusetts Department of Children and Families ("DCF").

Bianca finally interviewed Doe I about the incident on Thursday, February 4, 2016. During the interview, Doe I was accompanied by guidance counselor, Lauren Flynn,[3] but Flynn did not take an active role in questioning Doe I about the incident. Doe I also wrote two statements about the incident that day. Brown was in the room when Doe I wrote her first statement. In that statement, she described sexual contacts between Moe and four other students that occurred while Doe I "made out under a blanket" with Hanlon. (Defs' 56.1 Statement, Dkt. No. 103, ¶ 45.) She also wrote "Me & Cody did our own thing outside of the bus." *Id.* Later that day, Bianca, Brown, or another male employee of SVHS asked Doe I about inconsistencies between her first statement and statements previously provided by other students. She then wrote a second statement in which she stated that she had sexual intercourse with Hanlon on the bus. Doe I described another student "insist[ing]" that she and Hanlon "do stuff," but she did not describe their interaction as nonconsensual. (*Id.* at ¶ 52.) Bianca was aware that Doe I could not legally consent to sexual contact

---

[3] At the time of her 2021 deposition, this individual used the name Lauren Devine; however, because she used the name Lauren Flynn in 2015 and 2016, that is the name used here.

with Hanlon. Without talking about the incident with counseling staff, Bianca concluded Doe I was a voluntary participant and that a disciplinary response was appropriate.

SVHS staff contacted Doe II and told her to come to the school on Thursday, February 4, 2016. She met with Bianca and two other male SVHS employees.[4] Neither Doe I nor Flynn was present during that meeting. Bianca told Doe II that Doe I had sexual intercourse with a student while on the bus trip back from the wrestling meet. He also told her there were rumors Doe I was promiscuous and had previously tried to have sex with a boy in an SVHS bathroom. Doe II stated that Doe I was a virgin and would not have acted that way on the bus. When Bianca continued to question Doe II, she became upset, asked for her daughter, and was told, "why don't you just take a minute."[5] (*Id.* at ¶ 68.) Doe II indicated that she was done talking and left the room, repeating the request for her daughter and again was told to calm down. Doe II left the building, checked for her transportation, and returned a short time later saying, "You need to give me my daughter." (*Id.* at ¶ 70.) When SVHS staff were reluctant to get Doe I, Doe II began swearing at them then went back outside. SVHS staff then brought Doe I outside and Plaintiffs left SVHS together.

At some point prior to leaving the school, Plaintiffs were handed a letter notifying Doe I that Bianca was considering disciplining her in connection with "offenses of obscene and inappropriate language/actions, sexual relations on a school sponsored trip, instigating a dangerous situation, threats to safety, and disruption to the educational process." (*Id.* at ¶ 73.) The letter also informed Plaintiffs that Doe I was being placed on "emergency removal pending the completion of an investigation and will be afforded the opportunity to discuss the alleged incidents at a disciplinary hearing, if you so choose." (*Id.*) The letter stated the emergency removal would last two days, Friday,

---

[4] Doe II testified that she met with three men. Bianca was present, but the parties have not identified who else was at the meeting.
[5] At her deposition, Doe II described her interactions and some specific exchanges with SVHS staff without identifying which individuals made specific statements.

February 5, 2016 and Monday, February 8, 2016, and was necessary "to ensure a safe environment and to provide an opportunity for the investigation to be finalized." (*Id.*) Despite language in the letter describing the two-day period as needed to complete the investigation, Bianca did not complete his investigation report until March 11, 2016. The two-day emergency removal was later described in Doe I's school records as a two-day external suspension. Hanlon's school records indicate that he also received a two-day suspension on February 4, 2016.

After leaving SVHS, Doe II called her sister and a crisis center. Doe II explained in her call to the crisis center that Doe I had previously attempted suicide. Plaintiffs went to the crisis center where staff assessed Doe I and determined she could go home. Doe II's sister drove them from the crisis center to their home and later they went to Doe II's sister's home. While there, Doe I was very sleepy and did not act like herself. After they left the home of Doe II's sister, Doe I told Doe II that she had taken pills and Doe II took her to a nearby hospital. Doe I was seen briefly and then was transferred to a larger hospital. Later she was transferred to a specialized behavioral health hospital. While hospitalized, Doe I admitted taking multiple pills of three different medications and reported that she had been struggling to reintegrate at school following the December suspension, suicide attempt, and subsequent hospitalization. She also said she was upset about the two-day suspension imposed on February 4, 2016 in response to the events on the bus.

During her stay at the hospital, Plaintiff reported that she was not a willing participant in her sexual contact with Hanlon and that she told him "no" multiple times. The specialized hospital discharged Doe I on February 18, 2016. After she returned home, she told Doe II that Hanlon had forcibly raped her on the bus. Neither Doe I nor Doe II shared that information with any SVHS employees or attorneys representing SVHS until Doe I was deposed during this litigation.

On Tuesday, February 9, 2016, after the end of the two-day suspensions given to Doe I and Hanlon and while Doe I remained hospitalized, the Director of Student Services at SVHS filed two

7

reports with DCF related to the events that occurred on the bus on January 30, 2016. One was an "institutional filing" reporting neglect and the other reported sexual abuse of Doe I by Hanlon. The statements of fact provided by the parties provide no explanation for the delay between when SVHS staff and administrators learned of the sexual contact between Hanlon and Doe I on Monday, February 1, 2016 and when the report of sexual abuse was made to DCF on Tuesday, February 9, 2016. About two months later, on April 5, 2016, DCF notified Doe II that her attorney had declined to allow DCF to interview Doe I and that DCF had concluded the neglect allegation was unsupported. A few days later, on April 9, 2016, DCF referred the allegation of sexual abuse against Doe I by Hanlon to the District Attorney's Office. Neither party has identified any facts suggesting that an earlier report to DCF would have changed DCF's response.

Meanwhile, Andrew Linkenhoker, the principal of SVHS, terminated Bagdon's employment, effective immediately, via a letter dated February 24, 2016. Linkenhoker's letter informed Bagdon that his failure to appropriately supervise students was the reason for his termination. The letter referenced the sexual contact between students on the bus and earlier incidents that did not involve sexual contact between students. A few weeks later, Bianca completed his investigation into the bus incident. His meeting with Doe I on February 4, 2016 was the only time he spoke with her during the investigation. He documented his investigation with a letter, dated March 11, 2016, in which he described Doe I as having voluntarily engaged in sexual activity with Hanlon on the school bus on January 30, 2016.

Doe I returned to SVHS in late February, following her hospitalization. Concerned about Doe I's emotional vulnerability returning to the school environment and her ability to catch up on the schoolwork she had missed, SVHS counseling staff conferred with each other, SVHS teachers, and a clinician who had been providing out-patient treatment to Doe I both before and after Doe I's return to SVHS. On March 24, 2016, the SVHS Director of Student Services shared a draft safety

8

plan for Doe I with Bianca and others. A proposed safety plan was mailed to Doe II on April 14, 2016. The proposed safety plan prohibited contact between Doe I and Hanlon and established procedures for closely tracking Doe I's location during the school day and in the event she stayed after school.

In mid-May 2016, Doe I was involved in an altercation with another SVHS student unrelated to the bus incident. Afterwards, Bianca conducted a bullying investigation. He determined Doe I had not engaged in bullying but had twice violated the Student Handbook. Bianca recommended that Doe I receive detention for those violations. Bianca also conducted a separate investigation into an allegation that other students had bullied Doe I. He gathered statements regarding the alleged bullying from several students, but Doe I refused to provide a statement. Bianca contacted Doe II and told her that Doe I had been given a form to fill out with information about other students bullying her. Doe I did not return the form and Bianca concluded based on information provided by other students that no bullying had occurred.

Later in May, Doe I left her second period class without permission and reported that a male student had made hurtful comments to her that referenced the bus incident. Doe I and the other student involved provided statements about their interaction. They also participated in a mediation with the SVHS Vocational Director, who reported an amicable resolution. At some point after that incident, Doe I transferred to another high school. When SVHS sent Doe I's student records to her new high school, the records included a note Bianca wrote regarding the bus incident and the imposition of a two-day suspension. It is undisputed that SVHS had agreed that this note would not be sent to Doe I's new school. Bianca did not send the records and there is no evidence suggesting he intended for the note to be included in the records sent to Doe I's next school.

## IV.   DISCUSSION

Defendants advance two arguments in support of their motion for summary judgment. First, they assert Plaintiffs have failed to establish standing to bring their claims. Second, Defendants argue that the undisputed factual record establishes that each claim lacks merit. The court first addresses Defendants' standing argument and then turns to their claim-specific arguments.

Pursuant to Article III of the Constitution, federal courts may only adjudicate actual cases and controversies. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). The doctrine of standing has been developed to "ensure that federal courts do not exceed their authority." *Spokeo v. Robins*, 578 U.S. 330, 339 (2016). In order to have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 338. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Defendants contend Plaintiffs have failed to demonstrate that Plaintiffs suffered any injury fairly traceable to their conduct. Instead, Defendants argue Plaintiffs have shown only that they were harmed by Hanlon's conduct and Doe I's failure to accurately report what happened on the bus. The court disagrees.

At the outset of this litigation, Plaintiffs articulated two types of claims based on separate kinds of tangible injuries they suffered. They asserted claims against Hanlon based on the harm Doe I suffered as a direct result of his conduct. Those claims have since been settled. Separately, Plaintiffs alleged injuries caused by Defendants' conduct, especially the decision to immediately discipline Doe I, despite her age and prior mental health struggles. The revised understanding of Hanlon's conduct may, as a practical matter, make it harder for Plaintiffs to prove their claims against Defendants, but it does not change the nature of the injuries Plaintiffs say were caused by

10

Defendants' actions after the incident on the bus. Plaintiffs are not required to prove the merits of their claims to establish standing, only that they have alleged a sufficiently concrete injury in fact, fairly traceable to Defendants' conduct, and likely to be redressed if the court decides the case in their favor. *In re Evenflo Co., Inc., Marketing, Sales Practices & Prod. Liab. Litig.*, 54 F.4th 28, 34-35 (1st Cir. 2022) ("We stress that the standing inquiry is distinct from the determination of whether the plaintiffs' claims have merit; 'standing in no way depends on the merits of the plaintiff[s'] contention that particular conduct is illegal.'" (quoting *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016))). The court finds Plaintiffs have met these requirements and so there is no lack of standing that would warrant summary judgment.

Defendants have also argued summary judgment should enter because the factual record following discovery is insufficient to establish their liability as to any of Plaintiffs' claims. As an initial matter, the City and Bianca are entitled to summary judgment on Doe I's defamation claims (Count X) for the reasons given when the court denied Doe I's Motion for Summary Judgment as to the defamation claims (Dkt. No. 162). As the court explained in its prior order, Plaintiffs conceded at oral argument that the defamation claim brought against the City "was foreclosed by the Massachusetts Tort Claims Act [("MTCA")], Mass. Gen. Laws c. 258, § 10(c), which precludes municipal liability for intentional torts including libel and slander." (*Id.*) The court also determined that Bianca was acting within the scope of his official duties when he added statements to Doe I's educational records and his actions were, therefore, protected by a conditional privilege. (*Id.* (citing *Mulgrew v. City of Taunton*, 574 N.E.2d 389, 391-92 (Mass. 1991)).) As a result, Bianca could only be liable for defamatory statements made with actual malice. The record contains no evidence suggesting he acted with actual malice with respect to the notation in Doe I's educational records or its disclosure to Doe I's next school. (*Id.*)

11

Summary judgment is also appropriate as to Doe II's claim for negligent infliction of emotional distress (Count VIII). Defendants argue they did not owe Doe II a duty of care that governed the way Bianca, or any other SVHS employee, informed her about the bus incident. Plaintiffs did not identify an applicable duty of care in their opposition, and at the hearing, they did not oppose Defendants' argument. As Plaintiffs cannot prevail on Doe II's claim for negligent infliction of emotional distress without establishing that Defendants owed her a duty of care, the court concludes the City is entitled to summary judgment on Count VIII. *Lanier v. Pres. & Fellows of Harvard Coll.*, 191 N.E.3d 1063, 1073 (Mass. 2022) (stating a plaintiff "has no claim to relief for negligent infliction of emotional distress" unless defendant owed a duty of care to the plaintiff).

The court turns next to Plaintiffs' negligence claim asserted against the City, through the Board of Trustees of SVHS. "Section 2 of the [MTCA] provides that public employers are liable for negligent or wrongful acts or omissions of public employees acting within their scope of employment." *Cormier v. City of Lynn*, 91 N.E.3d 662, 665 (Mass. 2018). However, there are "several exceptions to that general waiver of sovereign immunity." *Id.* Defendants have argued that two of those exceptions, contained at § 10(b) and § 10(j), entitle them to summary judgment on Plaintiffs' negligence claim.

The first of these, the discretionary function exception, provides that "public employers are not liable for 'any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused.'" *Magliacane v. City of Gardner*, 138 N.E.3d 347, 363 (Mass. 2020) (quoting Mass. Gen. Laws c. 258, § 10(b)). Defendants contend the discretionary function exception applies to bar liability arising from disciplinary decisions made by SVHS employees because such decisions are discretionary. However, the Massachusetts Supreme Judicial Court has rejected such a broad reading of the

12

exception, concluding instead that the exception is narrow and applies only to "discretionary conduct that involves policy making or planning.'" *Id.* (quoting *Greenwood v. Town of Easton*, 828 N.E.2d 945, 948 (Mass. 2005)). In other words, the exception does not apply "where the purportedly tortious conduct of the governmental actor relates to the carrying out of previously established policies or plans." *Greenwood*, 828 N.E.2d at 949 (internal quotation marks omitted).

As the moving party, the City bears the burden of proving the disciplinary decisions made with respect to Doe I were "the product of policy making or planning considerations," rather than simply the implementation of a previously established policy. *Greenwood* at 950-51. Based on the record before the court, the City has not met that burden. Certainly, a school administrator, confronted with a situation like the bus incident and a student like Doe I, might want to consider larger policy considerations before deciding how to respond, but there is no evidence that Bianca, or anyone employed by SVHS, took such a step. Instead, the summary judgment record indicates that the decision to discipline Doe I was made without consulting school counseling staff familiar with Doe I and before any SVHS employee had even talked to Doe I about the bus incident. As a result, the discretionary function exception is not applicable the disciplinary actions taken by SVHS employees with respect to Doe I.

Defendants have also argued that the § 10(j) exception entitles the City to summary judgment on Plaintiffs' negligence claim. "Section 10(j) bars 'any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.'" *Cormier*, 91 N.E.3d at 665-66 (Mass. 2018) (quoting Mass. Gen. Laws c. 258, § 10(j)). "The purpose of § 10(j) is to preclude liability where the government fails to prevent harm from a privately created hazard, as opposed to a hazard that it has caused." *Magliacane*, 138 N.E.3d at 362. In the context of public schools, the Massachusetts

Supreme Judicial Court has ruled that § 10(j) exempts school districts from liability for harms caused by student conduct, including bullying, unless an affirmative act by the school district or its employees "materially contributed to creating the specific condition or situation that resulted in the harm." *Cormier*, 91 N.E.3d at 667 (internal quotation marks omitted). Defendants assert the § 10(j) exception applies to Plaintiffs' negligence claim because all the harms they experienced were the result of wrongful conduct by Hanlon and, at most, Defendants failed to prevent harms originally caused by Hanlon.

    The court agrees that the § 10(j) exception applies to the portions of Plaintiffs' negligence claim based on allegations that Defendants failed to prevent Hanlon's actions. Defendants are thus entitled to summary judgment to the extent Plaintiffs allege the City is liable for Bagdon's failure to properly supervise students riding the bus or any failure by Linkenhoker or Bianca to properly hire, train, or supervise Bagdon. However, Plaintiffs' negligence claim against the City is not based solely on Bagdon's failure to prevent Hanlon's actions. Instead, as discussed earlier, Plaintiffs have alleged that SVHS staff caused separate harms to Doe I due to their negligence in making decisions about how to investigate the bus incident and how to respond to her involvement. While it is linguistically possible to frame the investigatory and disciplinary actions by SVHS employees as failing to mitigate the harm caused by Hanlon, such a framing is misleading given the timing of the actions at issue and the nature of the harms alleged. Defendants' actions alone were the original cause of the separate distress Doe I says she suffered. Those actions occurred after the bus incident and any resulting injuries were independent of those caused by Hanlon. In *Cormier*, the Supreme Judicial Court emphatically concluded that the plaintiffs could not avoid the § 10(j) exception by recasting a school's failure to prevent several students from fatally pushing a classmate as a set of affirmative acts that placed the children together. *Id.* at 668. Here, the reverse is true; Defendants cannot obtain the protection of § 10(j) for actions they took well after Hanlon's wrongful conduct. As neither

14

exception to the MTCA applies to that portion of Plaintiffs' negligence claim based on investigatory and disciplinary actions taken after the bus incident, Defendants' Motion to Summary Judgment is denied as to Count I.

Defendants also argue they are entitled to summary judgment on Doe II's claim against the City for loss of consortium (Count IX) because parental claims for loss of consortium of a child cannot be brought against municipalities. In Massachusetts, parental loss of consortium claims are authorized by statute. Mass. Gen. Laws c. 231, § 85X. The statutory language provides that "[t]he parents of a minor child or an adult child who is dependent on his parents for support shall have a cause of action for loss of consortium of the child who has been injured against any *person* who is legally responsible for causing such injury." *Id.* (emphasis added). As Defendant observes, several judges in this district have concluded that there is no municipal liability under Mass. Gen. Laws c. 231, § 85X because the statutory definition of "person" does not include municipalities or other government entities. *Doe v. Dennis-Yarmouth Regional School Dist.*, 578 F. Supp. 3d 164, 183 (D. Mass. 2022); *see also Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 334-35 (D. Mass. 2016); *Doe v. Bradshaw,* No. 11-11593, 2013 WL 5236110, at *14 (D. Mass. Jan. 4, 2013). Though well-reasoned, this court respectfully declines to adopt that analysis because it is based on the "generally accepted rule of statutory construction that the word 'person' when used in a statute will not ordinarily be construed to include the State or political subdivisions thereof," rather than on the specific history of Mass. Gen. Laws c. 231, § 85X. *Fran's Lunch, Inc. v. Alcoholic Beverages Control Comm'n*, 700 N.E. 2d 843, 845 (Mass. App. Ct. 1998) (citing Mass. Gen. Law c. 4, § 7 and *Perez v. Boston Hous. Auth.*, 331 N.E..2d 801 (Mass. 1975)).

In 1988, the Supreme Judicial Court considered "whether a parent may recover for the loss of a child's consortium due to injuries negligently inflicted on the child by a third party," specifically the Massachusetts Bay Transportation Authority (MBTA). *Norman v. Massachusetts Bay Transp. Auth.*,

15

529 N.E.2d 139 (1988). Following a comprehensive review of the common law claim for loss of consortium, the Supreme Judicial Court concluded that "parents cannot recover for the loss of their injured child's consortium." *Id.* at 142. Three justices filed a dissenting opinion and the Massachusetts legislature responded the next year by passing Mass. Gen. Laws c. 231, § 85X to create a statutory cause of action for parental loss of consortium. *Monahan v. Town of Methuen*, 558 N.E.2d 951, 956 (Mass. 1990) (explaining that "General Laws c. 231, § 85X . . . was enacted in response to this court's decision in *Norman*"). Just two years after the *Norman* decision, the Supreme Judicial Court concluded parents whose adult child was injured while working as a firefighter could not bring a claim under Mass. Gen. Laws c. 231. Although they brought their claim against the Town of Methuen, the Supreme Judicial Court did not reject the claim because the defendant was a municipality. *Id.* at 956-57. Instead, the court based its decision as to "whether the parents in this case have a viable consortium claim . . .. [on] the meaning of the [statutory] dependency clause." *Id.* at 956.

A few years later, a parental loss of consortium claim against the City of Newton was tried before a Superior Court jury. The defendant appealed a different part of the jury's verdict and, while describing the verdict, the Massachusetts Court of Appeals noted, without concern, that the Superior Court had allowed the jury to consider the parental loss of consortium claim against the City of Newton. *Alter v. City of Newton*, 617 N.E.2d 656, 657-58 (Mass. App. Ct. 1993). About ten years later, a Massachusetts Superior Court specifically considered whether claims under Mass. Gen. Laws c. 231, § 85X could be brought against municipalities and determined barring such claims would be inconsistent with the Legislature's likely expectations about tort liability under the MTCA. *Cavanaugh v. Tantasqua Reg'l Sch. Dist.*, 29 Mass. L. Rptr. 353 (Mass. Super. Ct. 2012).

While this history is not conclusive, it suggests that Massachusetts courts, including the Supreme Judicial Court, have and will continue to read Mass. Gen. Laws c. 231, § 85X as permitting

16

claims against municipalities, notwithstanding the statute's use of the word "person" to describe the parties who may be liable. Until a different analysis is adopted by a Massachusetts appellate court, this court is persuaded that parental consortium claims may be brought under Mass. Gen. Laws c. 231, § 85X. Defendants' motion for summary judgment as to Count IX is, therefore, denied.

Finally, the court turns to Plaintiffs' claims brought pursuant to 42 U.S.C. § 1983, alleging Linkenhoker (Count II), Bianca (Count III), and Brown (Count IV) deprived Doe I of her due process and equal protection rights established under state and federal law by failing to treat her as a sexual assault victim. "The Supreme Court has consistently clarified that Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Borrás-Borrero v. Corporación del Fondo del Seguro del Estado*, 958 F.3d 26, 35 (1st Cir. 2020) (internal quotation marks omitted). As to rights arising under state law, it is well established "'that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim.'" *Id.* (quoting *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995).

Additionally, qualified immunity stands as a further barrier to successfully litigating § 1983 claims. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Qualified immunity applies unless the court concludes both that there has been a constitutional violation and that the violation was "sufficiently clear . . . under the specific facts of the case, [that] a reasonable defendant would have understood that he was violating the right." *Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014).

17

To establish that a violation was "sufficiently clear," a "plaintiff must 'identify either controlling authority or a consensus of persuasive authority sufficient to put [a state actor] on notice that his conduct fell short of the constitutional norm.'" *Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (quoting *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018)). While "there need not be 'a case directly on point[,]' . . . [t]he test is whether existing case law has 'placed the statutory or constitutional question beyond debate.'" *McKenney v. Mangino*, 873 F.3d 75, 83 (1st Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Additionally, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742.

Here, Plaintiffs assert two Massachusetts laws put Bianca, Linkenhoker, and Brown on notice that taking disciplinary action against Doe I violated clearly established law. The first of these statutes, Mass. Gen. Laws c. 265, § 23, criminalizes sexual intercourse with children under age sixteen. The second, Mass. Gen. Laws c. 119, § 51A, requires mandated reporters like Bianca, Linkenhoker, and Brown to ensure that suspected abuse and neglect, including incidents like the sexual contact between Hanlon and Doe I, are "immediately communicate[d]" to DCF. Neither statute places limits on the imposition of discipline in public schools. As a result, the court cannot find these statutes provide the type of specific guidance necessary to satisfy Plaintiffs' burden to establish that Bianca, Linkenhoker, and Brown were on notice that their actions after learning of the bus incident violated one or more of Doe I's rights "secured by the Constitution and laws of the United States."[6] *Borrás-Borrero*, 958 F.3d at 35 (internal quotation marks omitted). Since Plaintiffs

---

[6] Plaintiffs' grievances in this case—regarding the decision to treat Doe I as a voluntary participant in behavior that violated school rules—do not implicate the right to bodily integrity at issue when school staff allegedly fail to take corrective action in situations involving ongoing abuse. *See, e.g.*, *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 178 (D. Mass. 2016) (recognizing that school administrators may be liable under § 1983 if they are deliberately indifferent to students' rights to bodily integrity by failing to address reports of abusive behavior by a teacher).

have not cited any cases or statutes sufficiently clear to put a reasonable educator on notice that the actions taken by Bianca, Linkenhoker, or Brown violated one or more of Doe I's protected rights, Defendants are entitled to summary judgment on Plaintiffs' § 1983 claims (Counts II, III, and IV).

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 98) is hereby GRANTED as to counts II, III, IV, VIII, and X, and DENIED as to Counts I and IX. Though the no federal claims survive this ruling, given the advanced stage of this case, the court determines the interests of judicial economy, convenience, and fairness all favor the court's exercise of supplemental jurisdiction over the remaining claims. *Redondo Const. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011). An initial pretrial conference will be held remotely on April 11, 2023 at 10:00 AM.

It is So Ordered.

    /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge